UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GWENDOLYN D. BURTON                                    CIVIL ACTION

VERSUS                                                 NO. 13-661

CAROLYN W. COLVIN, COMMISSIONER                        SECTION "I" (2)
OF SOCIAL SECURITY ADMINISTRATION

## FINDINGS AND RECOMMENDATION

Plaintiff, Gwendolyn D. Burton, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Act. 42 U.S.C. §§ 405(g), 1381a. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).

As ordered, Burton filed a memorandum of facts and law. Record Doc. No. 10. The Commissioner filed a timely reply memorandum. Record Doc. No. 11.

I.       PROCEDURAL HISTORY

Burton filed her application for SSI on August 2, 2010, alleging disability since May 21, 2010, due to back and leg pain, diabetes, headaches and depression. (Tr. 61, 126, 140, 145). Plaintiff previously applied for disability insurance benefits. That

application was denied on May 20, 2010, making it conclusive for purposes of the Act that she was not disabled as of that date.  (Tr. 140-41).

After her application for SSI was denied at the agency level, Burton requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 24, 2011.  (Tr. 27-60).  On October 28, 2011, the ALJ issued a decision denying plaintiff's application for benefits.  (Tr. 13-22).  After the Appeals Council denied review on February 21, 2013, the ALJ's decision became the final decision of the Commissioner for purposes of this court's review.  (Tr. 1-5).

II.    STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.    Social Security Rulings 82-41 and 00-4p prohibit the Commissioner from relying on the vocational expert testimony because it is inconsistent with the Dictionary of Occupational Titles and does not identify specific transferable skills.

B.    The ALJ failed to include in the residual functional capacity all the limitations she recognized.

C.    The ALJ's findings that Burton's headaches and sleep apnea are not severe impairments are contrary to Stone v. Heckler, and are not supported by substantial evidence.

D.    The ALJ ignored relevant evidence and failed to find that Burton's carpal tunnel syndrome is a severe impairment.

III.   <u>ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL</u>

The ALJ made the following relevant findings:

1.    Plaintiff has not engaged in substantial gainful activity since August 2, 2010, the application date.[1]

2.    She has severe impairments consisting of back and leg pain, scoliosis, diabetes, history of headaches, and obesity.

3.    Burton's sleep apnea is, at most, a slight abnormality that has no more than a minimal effect on her ability to perform basic work activities and is not a severe impairment.

4.    She has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b), except that she can occasionally climb, balance, stoop, kneel, crouch and crawl; must avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation; can perform frequent, but not constant, fingering and feeling; and must be allowed to alternate between sitting and standing every 30 minutes as needed.

5.    Her hearing testimony and allegations are not entirely credible due to inconsistencies among her allegations and the medical evidence of record.

6.    She is unable to perform any of her past relevant work.

7.    When the application was filed, Burton was 46 years old and therefore is a younger individual age 18 to 49, as defined in the regulations.  She has at least a high school education and is able to communicate in English.

---

[1]"Claimants applying to the SSI program may not receive payments for a period predating the month in which they apply for benefits."  <u>Rosetti v. Shalala</u>, 12 F.3d 1216, 1224 n.20 (3d Cir. 1993) (citing 20 C.F.R. § 416.335); <u>accord</u> <u>Brown v. Apfel</u>, 192 F.3d 492, 495 n.1 (5th Cir. 1999).  "Thus, the month following an application . . . fixes the earliest date from which benefits can be paid."  <u>Hector v. Barnhart</u>, 337 F. Supp. 2d 905, 910 (S.D. Tex. 2004) (citing 20 C.F.R. § 416.335; <u>Brown</u>, 192 F.3d at 495 n.1).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Burton is not disabled, whether or not she has transferable job skills.

9.  Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform, such as check cashier, booth cashier, reception clerk and information clerk.

10. Burton has not been under a disability as defined in the Act since August 2, 2010, the date the application was filed.

(Tr. 15, 17-21).

IV.   <u>ANALYSIS</u>

A.   <u>Standards of Review</u>

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  <u>Richard ex rel. Z.N.F. v. Astrue</u>, 480 F. App'x 773, 776 (5th Cir. 2012) (citing <u>Perez v. Barnhart</u>, 415 F.3d 457, 461 (5th Cir. 2005)); <u>Stringer v. Astrue</u>, 465 F. App'x 361, 363 (5th Cir. 2012) (citing <u>Waters v. Barnhart</u>, 276 F.3d 716, 716 (5th Cir. 2002)).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389,

4

401 (1971); <u>Richard ex rel. Z.N.F.</u>, 480 F. App'x at 776; <u>Stringer</u>, 465 F. App'x at 363-64; <u>Perez</u>, 415 F.3d at 461.  This court may not reweigh the evidence in the record, try the issues <u>de novo</u> or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision.  <u>Halterman ex rel. Halterman v. Colvin</u>, No. 12-31099, 2013 WL 5913945, at *2 (5th Cir. May 9, 2013) (citing <u>Newton v. Apfel</u>, 209 F.3d 448, 452 (5th Cir. 2000)); <u>Stringer</u>, 465 F. App'x at 364.  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  <u>Luckey v. Astrue</u>, 458 F. App'x 322, 324 (5th Cir. 2011) (citing <u>Selders v. Sullivan</u>, 914 F.2d 614, 617 (5th Cir. 1990)); <u>Newton</u>, 209 F.3d at 452.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  <u>See</u> <u>Arkansas v. Oklahoma</u>, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  <u>Joubert v. Astrue</u>, 287 F. App'x 380, 382 (5th Cir. 2008) (citing <u>Perez</u>, 415 F.3d at 461).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  <u>Ray v. Barnhart</u>, 163 F. App'x 308, 311 (5th Cir. 2006) (citing <u>Perales</u>, 402 U.S. at 390); <u>Perez</u>, 415 F.3d at 461.

To be considered disabled and eligible for SSI, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. §§ 423(d)(1)(A). The Commissioner has promulgated regulations

that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§

404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2010). The regulations

include a five-step evaluation process for determining whether an impairment prevents

a person from engaging in any substantial gainful activity.[2] Id. §§ 404.1520, 416.920;

Alexander v. Astrue, 412 F. App'x 719, 720 (5th Cir. 2011) (citing Audler v. Astrue, 501

---

[2]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence. Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

F.3d 446, 447 (5th Cir. 2007)); Perez, 415 F.3d at 461.  The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Id.

The claimant has the burden of proof under the first four parts of the inquiry.  If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing.  When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Alexander, 412 F. App'x 720-21; Perez, 415 F.3d at 461.

The court weighs four elements of proof when determining whether there is substantial evidence of disability:  "'(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.'"  Chrisner v. Astrue, 249 F. App'x 354, 356 (5th Cir. 2007) (quoting Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)); accord Perez, 415 F.3d at 463.

B.     Factual Background

Burton testified that she is 47 years old, has no children and lives with her husband, to whom she has been married for 20 years, in Ponchatoula, Louisiana.  She said that her husband works.  She stated that she finished high school, earned some college credit and has not had any work-related or vocational training. (Tr. 33-34).  She

7

said that her sister drove her to the hearing because she is unable to sit in one position for a long period of time and that her sister always takes her when she needs to go for a long drive.  (Tr. 34-35).  She stated that she drives, but is only comfortable doing so for 10 to 15 minutes.

Burton testified that she is right-handed, five feet five inches tall and weighs 257 pounds, which is down from her usual weight of 280 pounds over the last three years. She said she has tingling in her hands and fingers from carpal tunnel syndrome, for which she wears a brace "most of the time," although she did not wear one at the hearing.  (Tr. 35).  Plaintiff explained that she usually sleeps with the brace and wears it "every now and then" on her right hand during the day.  She testified that her carpal tunnel syndrome is severe in the right hand, but moderate in the left hand.  She stated that she does not have trouble doing things with her right hand, except that her hand goes numb when she does a lot of scrubbing or lifting, which was required in the work she was doing.  (Tr. 36).

Burton testified that, in order to pay for her prescription medications, she has been working with her sister cleaning apartments four hours per day for three days per week since May 2011.  The ALJ stated that plaintiff's initial pay stubs indicate that she made $520 and $615.  (Tr. 36-37).  Plaintiff said that, "I do most of the wiping and stuff, and [my sister] does the upstairs and heavy mopping and the bending and stuff because it's

inconvenient for me for bending and squatting." (Tr. 37). She testified that she has insurance through her husband, but she has a lot of out-of-pocket medical expenses for which he does not pay. She said her marriage has always been like that. (Tr. 37, 50).

Plaintiff stated that she worked as an operations specialist for Bank One from 1990 until 1999, but she thought she had worked there for ten years. When the ALJ stated that the Commissioner's records indicated that she had earnings until 2003, she said "maybe" she had worked at Bank One until 2003.[3] (Tr. 37-38, 40). She said her job involved opening and closing accounts, filing, inputting information about account holders, and long hours of sitting at a computer. She testified that she resigned from Bank One because the job was located 35 miles away in Baton Rouge and that the long drive and the long hours of sitting at a desk became problematic, so she started missing a lot of work days. (Tr. 38). Plaintiff stated that she looked for similar work closer to home, but was unable to find a job until she found the cleaning job in May 2011. She testified that she did no other work between her resignation from Bank One and when she started cleaning apartments. (Tr. 38-39). She said that office jobs were scarce in Ponchatoula and the surrounding areas. (Tr. 46).

---

[3]Burton stated on her SSI Disability Report that she worked at a university from 1991 to 1998 and at a bank from 1998 to August 31, 2003. (Tr. 145-46).

9

Burton testified that she has helped her family care for her elderly mother since the 1980's or 1990's. She said she assists her mother with activities, including washing her mother's clothes and taking her to doctor's appointments. (Tr. 39). She stated that her mother lives with plaintiff's older sister.

The ALJ asked Burton whether she would be able to work at Bank One if she were offered the same job today. (Tr. 40). Plaintiff said she could not work if the job was in Baton Rouge because of the 35-mile drive and she could only work part-time if the job was in Ponchatoula because she cannot sit comfortably for long periods of time or for an entire work day. (Tr. 40-41).

Plaintiff testified that she can only walk a block because she then has "deep pain" in her lower back due to sciatic nerve problems, burning from her knees to the top of her feet, and numbness and tingling in her feet. She said that she has no feeling in the bottom center of her foot and that she has been diagnosed with neuropathy caused by diabetes. Burton stated that she can lift and carry five pounds, but that any more weight will cause her right hand to "give out" because of her carpal tunnel syndrome. (Tr. 41). She testified that she can stand for 20 minutes and can only sit for 30 minutes because of lower back pain and numbness in her hips and buttocks. (Tr. 41-42).

Burton stated that, in addition to the medications listed on Exhibit 8-E (Tr. 186), she takes Neurontin,[4] which she started taking when she began treatment in New Orleans in April or May 2011.  She testified that she started seeing doctors in New Orleans because she was unable to pay her medical bills in Covington and Hammond, and that her doctors in those locations will not see her again until she pays her bills.  (Tr. 42).

Plaintiff stated that she has a severe migraine headache about every other week. She said she wakes up with a headache every morning, especially if she takes off her CPAP[5] mask during the night, which she does because it makes her claustrophobic.  (Tr. 42-43).  She stated that she takes tramadol[6] and Excedrin for migraines and Cymbalta[7]

---

[4]Neurontin (generic name: gabapentin) is used to treat post-herpetic (shingles) nerve pain and to treat partial seizures in patients with epilepsy.  Physicians' Desk Reference 2590 (56th ed. 2002); accord PDRhealth, http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=neu1289.html&contentName=Neurontin&contentId=522 (last visited Dec. 23, 2013).

[5]Continuous positive airway pressure (CPAP) is a mechanical "technique of assisting breathing by maintaining the air pressure in the lungs and air passages constant and above atmospheric pressure throughout the breathing cycle."  MedlinePlus, http://www.merriam-webster.com/medlineplus/Continuous%20Positive%20Airway%20Pressure (last visited Dec. 23, 2013).  It is used to treat obstructive sleep apnea.  The Merck Manual (revised Mar. 2013), http://www.merckmanuals.com/professional/pulmonary_disorders/sleep_apnea/obstructive_sleep_apnea.html?qt=cpap&alt=sh (last visited Dec. 23, 2013).

[6]Tramadol hydrochloride is a centrally acting, synthetic opioid analgesic that "is indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time."  Physicians' Desk Reference 2519, 2520 (66th ed. 2012).

[7]Cymbalta (generic name duloxetine) is used to treat major depression, diabetic neuropathy, generalized anxiety disorder and fibromyalgia.  PDRhealth, http://www.pdrhealth.com/drugs/cymbalta

for migraines and anxiety.  (Tr. 43).  She testified that her migraines last three days, during which she cannot watch television or converse and is unable to do anything other than sit in a dark room because she has associated nausea.  (Tr. 43-44).

Plaintiff stated that she was scheduled to have an exploratory procedure of her stomach the next month for gastroparesis, which is continuous nausea caused by an erosive diabetic stomach.  (Tr. 43, 49).  She said she was diagnosed with this condition the previous day by Dr. Rabito, a gastroenterologist.  (Tr. 43-44).

Burton testified that she does not have any side effects from her medicines.  She stated that she takes Humalog[8] and Lantus[9] by injection and that she has taken injectible insulin for about four years.

Burton said she does her own cooking, cleaning and washing, but cannot do a "straight-out cleaning."  She said she does a little bit and then sits for a while because she cannot stand for long.  (Tr. 44).  She said she attends church twice on Sundays and sings in the choir and as a soloist.  She stated that she does not attend choir rehearsals, but

---

(last visited Dec. 23, 2013).

[8]Humalog is an injectable, fast-acting insulin.  Id. http://www.pdrhealth.com/drugs/humalog. (last visited Dec. 23, 2013).

[9]Lantus is a long-acting form of insulin that helps lower levels of sugar in the blood.  Id. http://www.pdrhealth.com/drugs/lantus (last visited Dec. 23, 2013).

plans to begin doing so.  She said she does not go out to any clubs, group activities or casinos.

Plaintiff testified that she has no hobbies or pets and that her husband does the yard work.  She said she sees her mother at least every other day and sometimes daily. She testified that she can care for herself, including brushing her hair and buttoning her clothes.  (Tr. 45).

Burton testified that she typically sleeps five to six hours each night because she is restless and cannot find a comfortable position.  She stated that people at the bank where she used to work could not understand why she had "to be up and down and in and out, not being able to sit or stand for a period of time.  They kind of made it hard for me." (Tr. 46).  She said she has mental health problems consisting of difficulty staying focused to complete tasks.  (Tr. 46-47).

Plaintiff stated that she received a brace for her hand when she was diagnosed with carpal tunnel syndrome.  She said she was instructed to wear it only at night, but she sometimes wears it during the day because her fingers "stay numb."  She testified that her doctor told her she needs surgery on her right hand, but no date has been set for the surgery.  She said that her doctors were "trying to set up a situation for my – for the carpal tunnel and my back because they always give me injections.  But my blood sugar be [sic] so high, they didn't give it to me the last time.  So they're going to reschedule

13

me." (Tr. 47-48).  She stated that her doctors are trying to help her manage the pain to avoid surgery, but the last doctor who examined her said he thinks she needs surgery. She said he did not tell her what type of surgery she needs.

Burton testified that she had an EMG on June 28, 2011, to study nerve conduction in her back, and that she plans to follow up with the neurologist.  Burton stated that she had injections in her back and hip, which helped the pain for about a week, and that the doctor wanted to give her an injection in her hand, but did not because her blood sugar was very high.  (Tr. 48).

Burton stated that she takes Xanax and Cymbalta for her anxiety.  She said that when she takes them together they are helpful "for the most part . . . but some days it feel [sic] like it doesn't touch me."  She said she had been taken off of Xanax for a while, but her doctor added it back because she was having more severe anxiety.  (Tr. 49).  She testified that she "occasionally" has anxiety attacks when she wakes up in the morning, when she fears leaving home if she has a doctor's appointment or something else to do. She said she feels more secure if she stays in her house.  (Tr. 49-50).

Plaintiff stated that she shares with her sister the money reflected on the two pay stubs that she submitted.  She said that the checks are made out to her because the woman who hired them for the apartment cleaning job knew her, but not her sister, and hired the two of them based on her knowledge of Burton.  Plaintiff testified that her sister does the

14

majority of the work and allows her to work so she can afford to buy her medications. (Tr. 50, 52).

Burton testified that her husband has never helped her pay for her medications. When asked how she has paid for medicine in the past, she stated that Dr. Harold Miller, who treats her for diabetes, "is so good about giving me medications."  (Tr. 50).  She testified that her husband "feel [sic] that when he pay [sic] for the house note and everything, that's taken care of me.  But that was the best I can do when I – half the time I didn't have my medicine . . . ."  (Tr. 50-51).  She said she is trying to enter a free prescription program at Charity Hospital.

Burton testified that her sleep apnea causes her to wake up often during the night and that she uses two pillows to sleep.  She said she has talked to her doctor about getting a different CPAP mask because the one she has covers her nose and makes her claustrophobic.  She stated that she hopes to obtain one that "only sets on the nostrils," which she thinks she could handle better, but she will "have to do a little more out of pocket in order to get that."  (Tr. 51).

C.    Vocational Expert Testimony

A vocational expert, Thomas J. Meunier, Jr., testified at the hearing that he would advise the ALJ if any part of his testimony differed from the Dictionary of Occupational Titles.  He stated that Burton's past job as a housekeeper was unskilled work at a light

15

exertional level.  He said that her job as a janitor at a university, which she did from 1991

to 1998, was medium, unskilled work.  (Tr. 53).  He testified that plaintiff's job as a

cafeteria worker at the university during the same time period was light and unskilled.

Meunier said that each of these unskilled jobs has an SVP of 2.[10]  He stated that Burton's

job as a bank data entry clerk was sedentary and semi-skilled with an SVP of 4.  (Tr. 53-

54).

The ALJ posed a hypothetical of an individual with plaintiff's age, education, and

past relevant work experience who can occasionally lift and carry 20 pounds; frequently

lift and carry 10 pounds; stand and walk six hours in an eight-hour day; sit for six hours

in an eight-hour day; and can occasionally climb, balance, stoop, kneel, crouch and

---

[10]

"SVP" refers to the "specific vocational preparation" level which is defined in the DOT
as "the amount of lapsed time required by a typical worker to learn the techniques,
acquire the information, and develop the facility needed for average performance in a
specific job-worker situation." Dictionary of Occupational Titles, Appendix C, page
1009 (4th ed. 1991).  SVP 2 means "anything beyond a short demonstration up to and
including 1 month;" SVP 3 means "over 1 month up to and including 3 months;" SVP
6 means "over 1 year up to and including 2 years" and SVP 7 means "over 2 years up to
and including 4 years."  Id.
        As stated in SSR 00-4p, 2000 WL 1898704 at *3:
        The DOT lists a specific vocational preparation (SVP) time for each
        described occupation.  Using the skill level definitions in 20 C.F.R.
        404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2;
        semi-skilled work corresponds to an SVP of 3-4; and skilled work
        corresponds to an SVP of 5-9 in the DOT.  Although there may be a
        reason for classifying an occupation's skill level differently than in the
        DOT, the regulatory definitions of skill levels are controlling.
Bray v. Comm'r, 554 F.3d 1219, 1230 n.4 (9th Cir. 2009) (Wu, J., concurring); accord Creech v. UNUM
Life Ins. Co., 162 F. App'x 445, 459 (6th Cir. 2006); Dikeman v. Halter, 245 F.3d 1182, 1186 n.2 (10th
Cir. 2001).

crawl; but should avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation.  Meunier testified that this person could perform all of plaintiff's past relevant jobs except janitor, which was a medium-exertion job.  (Tr. 54).

The ALJ added to the first hypothetical a limitation that the person can frequently, but not constantly, use the fingers for fingering, feeling and manipulation, including keying data.  Meunier testified that this hypothetical person could not perform plaintiff's past job as a data entry clerk, which required constant fingering, but could perform the jobs of housekeeper or cafeteria worker.  (Tr. 55).

The ALJ then added to the hypothetical that the same individual must be able to alternate sitting and standing every 30 minutes.  Meunier stated that this eliminated the jobs of housekeeper and cafeteria worker, which do not permit a sit/stand option.  However, he testified that such a person could work as a booth cashier.  He noted that some low level skills are transferable from plaintiff's past work as a data entry clerk to cashiering at a semi-skilled level with an SVP of 3, so that he would not limit his testimony about available jobs to unskilled work.  (Tr. 56).

Meunier testified that this hypothetical person could perform sedentary jobs such as booth cashier, which is unskilled (Dictionary of Occupational Titles number 211.462-010); check cashier, which is semi-skilled (Dictionary of Occupational Titles number 211.462-026); information clerk (both unskilled and semi-skilled); or receptionist (both

unskilled and semi-skilled, the latter being Dictionary of Occupational Titles number 237.367-010); all of which exist in significant numbers in the state and national economies. (Tr. 56-58).

The ALJ proposed a final hypothetical of an individual of Burton's age, education and past relevant work experience who would miss three days of work every two weeks because of severe headaches. Meunier testified that this person could not perform any of plaintiff's past relevant work or any other work. (Tr. 58).

Plaintiff's counsel posed a hypothetical of an individual with a residual functional capacity for light work, but with a 30-minute alternating sit/stand option, and who has moderate carpal tunnel syndrome in the left hand and severe carpal tunnel syndrome in the right, dominant hand and can only occasionally perform fine and gross manipulation with the dominant hand; occasionally, which counsel defined as up to one-third of the work time, cannot tolerate the stress and pressures associated with day-to-day work activities and demands; and less than occasionally, meaning approximately one-fourth of the work time, experiences difficulty sustaining effort and maintaining a normal pace over the course of a 40-hour work week. (Tr. 58-59). Meunier testified that such a person would not be able to maintain work activity. (Tr. 59).

D.    <u>Medical Evidence</u>

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 16-23).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    <u>Plaintiff's Appeal</u>

1.    The vocational expert's testimony is substantial evidence on which the ALJ appropriately relied.

Burton argues that the ALJ erroneously relied on the vocational expert's testimony that jobs are available that a person with plaintiff's residual functional capacity could perform.  The ALJ found at the fourth step of the sequential evaluation that Burton has the residual functional capacity to perform light work, except that she can only occasionally climb, balance, stoop, kneel, crouch and crawl; must avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation; can perform frequent, but not constant, fingering and feeling; and must be allowed to alternate between sitting and standing every 30 minutes as needed.

At the fifth step, the ALJ relied on Meunier's testimony that a person with this residual functional capacity could perform available jobs, such as check cashier, booth cashier, reception clerk (semi-skilled) and information clerk (unskilled).  Plaintiff argues

that this testimony is not substantial evidence because (1) it is inconsistent with the Dictionary of Occupational Titles regarding the jobs of booth cashier and information clerk, and (2) Meunier did not describe any specific skills that are transferable from plaintiff's past work as a semi-skilled data entry clerk to the semi-skilled cashiering jobs.

Burton first contends that Meunier's testimony that the job of booth cashier is sedentary conflicts with the Dictionary of Occupational Titles, which classifies that job as light under the code number that Meunier cited. See Dictionary of Occupational Titles no. 211.462-010, http://www.occupationalinfo.org/21/211462010.html (Cashier II job defined as light). Citing Social Security Ruling 00-4p, Burton argues that this conflict prevents the ALJ from relying on Meunier's testimony. See SSR 00-4P, 2000 WL 1898704, at *3 (Dec. 4, 2000) ("[A]djudicators may not rely on evidence provided by a [vocational expert] . . . if that evidence is based on underlying assumptions or definitions that are inconsistent with our regulatory policies or definitions. . . . [The terms sedentary [and] light . . . have the same meaning as they have in the exertional classifications noted in the DOT. . . . For example, if all available evidence (including [vocational expert] testimony) establishes that the exertional demands of an occupation meet the regulatory definition of 'medium' work . . . , the adjudicator may not rely on [vocational expert] testimony that the occupation is 'light' work.") (emphasis added).

In the instant case, however, the ALJ's hypotheticals to Meunier incorporated the exertional levels of light work and the ALJ specifically found that Burton can perform light work with the postural and nonexertional limitations stated in the ALJ's opinion. Meunier's testimony that the job of booth cashier is sedentary is therefore a harmless procedural error that does not affect plaintiff's substantial rights because the ALJ found that she can perform the more strenuous exertional tasks of light work, with some postural and nonexertional limitations. Alexander v. Astrue, 412 F. App'x 719, 722 (5th Cir. 2011) (citing Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007)).

"Even assuming that a violation of SSR 00-4p did occur, plaintiff has not shown that [s]he was prejudiced thereby as [s]he points to no additional evidence that might have led to a different decision." Morris v. Astrue, No. 10-3339, 2011 WL 7341504, at *12 (E.D. La. Dec. 14, 2011), report & recommendation adopted, 2012 WL 519629 (E.D. La. Feb. 15, 2012) (citing Barratt v. Astrue, No. 07-51067, 2008 WL 2325636, at *2 n.1 (5th Cir. June 6, 2008); Jackson v. Astrue, No. 4:11-CV-28-Y, 2011 WL 4943547, at *11 (N.D. Tex. Aug. 23, 2011), report & recommendation adopted, 2011 WL 4940998 (N.D. Tex. Oct. 17, 2011)). According to Social Security Ruling 00-4p, the Dictionary of Occupational Titles "lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings." SSR 00-4P, 2000 WL 1898704, at *3 (emphasis added). Meunier's

21

testimony that Burton can perform the job of booth cashier is substantial evidence on which the ALJ can rely because the ALJ found that plaintiff could perform less than a full range of light work, which is within the exertional definition of the job in the Dictionary of Occupational Titles.

Burton next argues that Meunier's testimony that information clerk jobs are available at both the semi-skilled and unskilled levels conflicts with the Dictionary of Occupational Titles and thus cannot be substantial evidence regarding the availability of such unskilled work.  She cites Dictionary of Occupational Titles number 237.367.010,[11] which states that an "appointment clerk (clerical) or reception clerk" job has an SVP of 3, or semi-skilled.  http://www.occupationalinfo.org/23/237367010.html.

The Dictionary of Occupational Titles does not always control over contradictory evidence from a vocational expert.  The Dictionary of Occupational Titles

> itself acknowledges that its information "reflects jobs as they have been found to occur, but they may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities. DOT users demanding specific job requirements should supplement this data with local information detailing jobs within their community."  DOT at xiii (emphasis added).  Even [Social Security] Ruling 00-4p counsels that the DOT "lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is

---

[11]My reading of Meunier's testimony indicates that he cited this code number only for the semi-skilled, reception clerk job and that he did not testify regarding a code number for the unskilled job of information clerk.  (Tr. 57-58).  However, the transcript of his testimony is not entirely clear on this point, so the court addresses the alleged error as plaintiff asserts it in her memorandum.

> performed in specific settings." 65 Fed. Reg. at 75,760. Thus, it advises reference to a [vocational expert] "or other reliable source of occupational information" for "more specific information about jobs or occupations than the DOT." Id.; see also Carey v. Apfel, 230 F.3d 131, 146 (5th Cir. 2000) (noting that "the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation"). As so eloquently expressed by the Tenth Circuit: "Indeed, what would be the point of vocational testimony (or expert testimony in general) if it could not reach beyond matters already established through administrative (or judicial) notice?" Gay v. Sullivan, 986 F.2d 1336, 1340 (10th Cir. 1993).

Thompson v. Astrue, No. 8:09-01968-JFA-BHH, 2010 WL 3878729, at *5 (D.S.C. June 16, 2010), report & recommendation adopted, 2010 WL 3880047 (D.S.C. Sept. 28, 2010), aff'd, 442 F. App'x 804 (4th Cir. 2011).

> In the Fifth Circuit, a vocational expert's
>
> erroneous classification of the exertion level or skills required to perform a particular job may call into question the probative value and reliability of such testimony. However, "when there is a conflict between the [vocational expert's] testimony and the DOT, the ALJ may rely upon the [expert's] testimony provided that the record reflects an adequate basis for doing so."

Barratt, 2008 WL 2325636, at *2 (quoting Carey, 230 F.3d at 146).

In this case, Meunier consulted reference materials during his testimony and testified regarding specific numbers of both semi-skilled and unskilled information clerk jobs available in the Louisiana and national economies. Thus, "the record reflects an adequate basis for the ALJ's reliance on [Meunier's] testimony . . . [and Meunier] testified that such an individual could perform each of the jobs the ALJ cited in her

opinion."  Id.  The generic definition of the skill level of one type of information clerk in the Dictionary of Occupational Titles is not controlling in the face of this specific, expert evidence.  See Ellis v. Astrue, No. 11-2121, 2013 WL 595071, at *5 n.6 (W.D. La. Jan. 17, 2013), report & recommendation adopted, 2013 WL 596425 (W.D. La. Feb. 14, 2013) (citing Barratt, 2008 WL 2325636, at *2; Carey, 230 F.3d at 146) ("[W]here, as here, the vocational expert incorrectly identified a semi-skilled job as unskilled[, . . .] the vocational expert's response to the ALJ's hypothetical and plaintiff's testimony provided an adequate basis for the ALJ to rely on the vocational expert's testimony, despite the conflict.").

Even if the conflict between Meunier's testimony and the Dictionary of Occupational Titles eliminates the job of information or reception clerk as an available job that Burton can perform, this conflict does not affect her substantial rights because Meunier identified three other jobs that she is capable of performing and that are available in significant numbers. Id. (citing 42 U.S.C. § 423(d)(2)(A); Johnson v. Chater, 108 F.3d 178, 181 (8th Cir. 1997)); see also Fletcher v. Astrue, No. 5:09-CV-070-BG, 2010 WL 1644877, at *4-5 (N.D. Tex. Mar. 31, 2010), report & recommendation adopted, 2010 WL 1644874 (N.D. Tex. Apr. 23, 2010) (Although the ALJ erred by finding that plaintiff could perform one of three jobs identified by the vocational expert,

the Commissioner carried his burden to demonstrate that two other jobs existed in significant numbers, so that remand was not necessary.).

Burton also argues that Meunier's failure to describe any specific skills that are transferable from her past work as a semi-skilled data entry clerk to the semi-skilled jobs of check cashier and reception clerk renders his testimony insufficient to support the ALJ's finding that she can perform those jobs. A claimant's skills are transferable when "the skilled or semi-skilled work activities that he has done in the past can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work." 20 C.F.R. §§ 404.1568(d)(1), 416.968(d)(1).

Burton cites Social Security Ruling 82-41, which provides that "[w]hen the issue of skills and their transferability must be decided, the adjudicator or ALJ is required to make certain findings of fact and include them in the written decision. . . . When a finding is made that a claimant has transferable skills, the acquired work skills must be identified . . . ." SSR 82-41, 1982 WL 31389, at *7 (1982) (emphasis added).

Meunier raised the issue of transferable skills in his testimony without any questions from the ALJ or plaintiff's attorney on the subject. As the ALJ noted in her opinion, "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is not disabled, whether or not she has transferable job skills." (Tr. 20). Citing

25

20 C.F.R. Pt. 404, Subpt. P, App. 2, the ALJ explained that if Burton had the residual

functional capacity to perform the full range of light work, a finding of not disabled

would be directed by Medical-Vocational Rule 202.21.  Id.  Under Medical-Vocational

Rules 202.21 and 202.22, a younger individual (defined as between ages 18 and 49) with

at least a high school education and past relevant skilled or semi-skilled work, who can

perform the full range of light work, will be found not disabled regardless whether she

has skills that are not transferable (Rule 202.21) or has skills that are transferable (Rule

202.22).

However, the ALJ found that Burton is capable of less than the full range of light

work because of her additional postural and nonexertional limitations.  Thus, the ALJ

used the Medical-Vocational Rules only as a framework and sought vocational expert

testimony to determine whether jobs existed that a person with this residual functional

capacity could perform.

> "[W]here an individual has an impairment or combination of
> impairments resulting in both strength limitations and nonexertional
> limitations," 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2) (1991), or
> "[w]here exertional limitations prevent the claimant from doing the full
> range of work specified in his assigned residual function category,"
> Campbell [v. Bowen, 822 F.2d 1518, 1523 n.2 (10th Cir. 1987)], the grids
> [Medical-Vocational Guidelines] "do not direct a conclusion of disabled or
> not disabled."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(a).  In such a
> case, vocational expert testimony is required to determine "whether jobs
> exist for someone with the claimant's precise disabilities." Ash v. Sullivan,
> 748 F. Supp. 804, 809 (D. Kan.1990) (citation omitted).  "[T]he [grids] . . .

are considered in determining first whether a finding of disabled may be possible based on strength limitations alone." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2).  <u>If the grids reflect a finding of not disabled, they "can be used only as a framework for determining what the claimant can still do in light of his impairments."</u>  <u>Campbell</u>, 822 F.2d at 1523 n.2. Without the grids, the ALJ must resort to testimony from a vocational expert to establish that a significant number of jobs exist in the national economy which the claimant can perform.

<u>Trimiar v. Sullivan</u>, 966 F.2d 1326, 1332-34 (10th Cir. 1992); <u>accord</u> <u>Charles v. Astrue</u>, 291 F. App'x 552, 554 (5th Cir. 2008); <u>Moore v. Soc. Sec. Admin.</u>, 153 F. App'x 945, 947 (5th Cir. 2005); <u>Newton</u>, 209 F.3d at 458.

As the ALJ stated, transferability of skills is not an issue under the framework of the Medical-Vocational Guidelines for a younger individual who has the residual functional capacity to perform light work.  Under the rules governing light work, whether skills are transferable is a question that <u>only</u> needs to be decided for persons of advanced age (age 55 and over) with certain levels of education because the rules direct that such persons are disabled if they have no transferable skills, Rules 202.02, 202.06, but are not disabled if they have transferable skills.  Rules 202.03, 202.07.

Social Security Ruling 82-41 only applies when the issue of skills and their transferability must be decided.  In this case, the issue of skills and their transferability need not be decided.  Thus, the rule does not apply and the ALJ was not required to identify any transferable skills.

27

Even if Social Security Ruling 82-41 applies, however, the ALJ did not err by failing to ask Meunier to identify specific skills.  Plaintiff has cited no authority from the Fifth Circuit that imposes such a requirement.  In addition,

> there is a circuit split as to whether Social Security Ruling [82-41] . . . requires the ALJ and [vocational expert] to identify transferable skills or not.  See Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 549 (6th Cir. 2004) (holding that the ALJ does not need to identify transferable skills when relying on the testimony of a VE); Bray v. Comm'r of Soc. Sec., 554 F.3d 1219, 1223-1226 (9th Cir. 2009) (holding that the ALJ must identify transferable skills when relying on the testimony of a VE).  The Eighth Circuit does not require the ALJ to identify transferable skills.

Craft v. Astrue, No. 10-5153, 2011 WL 2936402, at *10 n.11 (W.D. Ark. July 21, 2011).

The Eighth Circuit held in Tucker v. Barnhart, 130 F. App'x 67, 68 (8th Cir. 2005), that an ALJ may rely on a vocational expert's testimony that plaintiff has transferable skills and that neither the ALJ nor the vocational expert are required to identify the skills with particularity.  Similarly, the Sixth Circuit stated in Wilson that

> the testimony of a vocational expert identifying specific jobs available in the regional economy that an individual with the claimant's limitation could perform can constitute substantial evidence supporting an ALJ's finding at step 5 that the claimant can perform other work.  With respect to transferable skills, 20 C.F.R. § 404.1568 defines transferable skills, states how the agency determines that skills are transferable to other jobs, and

> describes a range of degrees of transferability of skills. The regulation does
> not explicitly mandate the enumeration of transferable skills at step 5.

Wilson, 378 F.3d at 549 (citations omitted).

My research has located no Fifth Circuit decisions that address this issue directly.
See also Tanksley v. Colvin, No. 3:12-CV-02050-BH, 2013 WL 5350912, at *8 (N.D.
Tex. Sept. 24, 2013) ("The Fifth Circuit has not yet determined whether an ALJ commits
error at step five by relying on a VE's testimony that the claimant can perform other jobs,
but neither one identifies the claimant's skills that are transferable to those jobs.");
Sergent v. Astrue, No. 10-cv-01041, 2011 WL 3299051, at *10 (S.D. Tex. Aug. 1, 2011)
(citing Hampton v. Bowen, 785 F.2d 1308, 1311 (5th Cir. 1986)) ("Notwithstanding
determinations made in other circuit courts, the Fifth Circuit has not expressly ruled on
this issue and Plaintiff has not provided any case law with binding authority over this
court. Nevertheless, as Defendant correctly notes, a case will not be remanded in this
circuit simply for the reason that the ALJ did not use 'magic words.'").

However, the Fifth Circuit has held that an ALJ's finding that the skills a plaintiff
"acquired in her past relevant work . . . 'can be applied to meet the requirements of
semiskilled work activities of other work' is supported by the vocational expert's
testimony at the hearing that those skills 'would transfer to other sedentary work.'" Scott
v. Shalala, 43 F.3d 669, 1994 WL 725034, at *5 (5th Cir. 1994). The language that the

Fifth Circuit quoted from the vocational expert's testimony indicates that this circuit, like the Sixth and Eighth Circuits, does not require great specificity in the expert's testimony about plaintiff's transferable skills in order to render that testimony substantial evidence on which the ALJ can rely.

Based on these authorities, I find that Meunier's testimony that plaintiff had skills transferable from her semi-skilled data entry job to semi-skilled work as a check cashier and reception clerk is substantial evidence on which the ALJ could rely.  Tucker, 130 F. App'x at 68; Wilson, 378 F.3d at 549; Vaughan v. Shalala,  58 F.3d 129, 130, 131, 132 (5th Cir. 1995); Craft, 2011 WL 2936402, at *10.

Finally, as to all of Burton's arguments under this assignment of error, I note that she was represented by an attorney at the hearing.  However, her attorney did not ask Meunier to clarify his testimony about the skill and exertional levels of the jobs he named or about her specific transferable job skills.  The Fifth Circuit disapproves of a represented plaintiff's failure to question the vocational expert about an issue during the hearing, then claiming on appeal that the ALJ erred by relying on the unquestioned testimony.

> [Plaintiff's] counsel had an opportunity at the administrative hearing to
> cross-examine the [vocational expert] regarding the classification of the
> jobs she cited, but opted not to do so.  As this court has explained,
> "claimants should not be permitted to scan the record for implied or
> unexplained conflicts between the specific testimony of an expert witness

and the voluminous provisions of the [Dictionary of Occupational Titles], and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing."

Barratt, 2008 WL 2325636, at *2 (quoting Carey, 230 F.3d at 146-47); accord Bryant v. Astrue, 272 F. App'x 352, 356-57 (5th Cir. 2008); Ellis, 2013 WL 595071, at *4-5 (citing Carey, 230 F.3d at 146); see also Perez, 415 F.3d at 464 (citations omitted) ("Perez's attorney neither cross-examined the [vocational expert] nor provided any contrary evidence.  We have held that where the claimant offers no evidence contrary to the [vocational expert's] testimony, the claimant fails to meet his burden of proof under the fifth step of the disability analysis" to rebut the Commissioner's evidence that jobs exist that the claimant can perform.).

Meunier's testimony is substantial evidence on which the ALJ appropriately relied.  Accordingly, this assignment of error lacks merit.

        2.    The ALJ included in the residual functional capacity all the limitations that she recognized.

In this assignment of error, Burton makes two arguments:  (1) the ALJ recognized that she has a medically determinable, non-severe, affective disorder that causes non-exertional mental limitations, but erroneously failed to include those limitations in her residual functional capacity assessment and hypothetical questions to the vocational expert, and (2) the ALJ failed to include a restriction that Burton cannot crouch, squat or

stoop, despite according substantial weight to a physician's opinion that she cannot do these maneuvers.

As to plaintiff's first argument, the ALJ found at step two of the sequential evaluation that Burton has a mild impairment in her ability to sustain effort and persist at a normal pace over a 40-hour work week and a mild to moderate impairment in her ability to handle stress and pressure associated with day-to-day work activity. These findings are based on the same findings in the consultative psychological examination of Sandra Durdin, Ph.D., on November 8, 2010 (Tr. 309-11), to which the ALJ afforded substantial weight because it is consistent with the medical evidence of record. In determining at the third step that plaintiff's mental impairment does not meet any listing, the ALJ concluded, based on the same evidence, that Burton has mild restriction in her activities of daily living, mild difficulties in maintaining social functioning and mild deficiencies in concentration, persistence or pace. (Tr. 16). Plaintiff argues that the ALJ should have incorporated these findings of mental limitations in her residual functional capacity determination at the fourth step of the sequential analysis. See 20 C.F.R. § 416.945(e) ("When you have a severe impairment(s), but your symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment . . . , we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity.") (emphasis added).

32

In addition to the findings above, the ALJ noted (Tr. 16) that Burton has neither sought nor required specialized treatment or counseling to address her mental health concerns, and that Dr. Durdin found that plaintiff has normal mood, affect, memory and cognitive skills and fair judgment and insight.  Dr. Durdin opined that Burton has no significant limitations in her abilities to understand, remember and carry out simple and detailed instructions; can maintain attention to perform simple, repetitive tasks for two-hour blocks of time; and can relate to others.

Substantial evidence supports the ALJ's decision not to include any mental limitations in plaintiff's residual functional capacity.  Dr. Durdin's findings that plaintiff has essentially normal mental functioning and only a mild impairment in her ability to sustain effort and persistence and a mild to moderate impairment in her ability to handle stress and pressure associated with work activity are not contradicted by any medical evidence.  Dr. Durdin noted that Burton does not receive any counseling, has not pursued evaluation and treatment by a psychiatrist as recommended by her primary care provider, and only intermittently takes medication prescribed by her primary care doctor for depression.  (Tr. 311).  Kelly Ray, Ph.D., reviewed the medical records and opined on December 4, 2010 that Burton's condition is not severe and that she has only mild restrictions in her activities of daily living and in maintaining concentration, persistence and pace.  (Tr. 66-67).  The medical records indicate that plaintiff did not seek an

33

appointment with a mental health counselor until February 2011 (Tr. 409), after her treating internist, J. Ralph Millet, Jr., M.D., recommended for the second time in six months that she seek such therapy.  (Tr. 234, 416).

In addition, the ALJ found plaintiff's allegations of severe limitations not entirely credible because of inconsistencies between her allegations and the record, her failure to seek treatment for some conditions and her noncompliance with some prescribed treatment.  (Tr. 19).  A claimant's lack of need for medication or failure to seek treatment are relevant factors to consider in determining the severity of an alleged impairment and may be used in conjunction with the medical reports to discount plaintiff's complaints of depression, disabling pain or other limitations.  Doss v. Barnhart, 137 F. App'x 689, 690 (5th Cir. 2005); Bryan v. Halter, 252 F.3d 1357, 2001 WL 422878, at *2 (5th Cir. Apr. 5, 2001) (citing 20 C.F.R. §§ 404.1530, 416.930; Wren v. Sullivan, 925 F.2d 123, 128 (5th Cir. 1991)); Austin v. Apfel,  205 F.3d 1338, 1999 WL 1338401, at *1 (5th Cir. 1999) (citing Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991)).

The ALJ has the responsibility to evaluate the credibility of witnesses, Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002), and "credibility conclusions are 'precisely the kinds of determinations that the ALJ is best positioned to make.'"  Spruill v. Astrue, 299 F. App'x 356, 358 (5th Cir. 2008) (quoting Falco, 27 F.3d at 164).  Thus, the ALJ's credibility evaluation is entitled to considerable deference by this court.  McKnight v.

34

Astrue, 340 F. App'x 176, 181 (5th Cir. 2009); Bedford v. Astrue, 236 F. App'x 957, 962

(5th Cir. 2007).  The ALJ's explanation of her reasons for finding plaintiff not entirely

credible is all that is required.  James J. Flanagan Stevedores, Inc. v. Gallagher, 219 F.3d

426, 430 & n.8 (5th Cir. 2000) (citing Falco, 27 F.3d at 163); Godbolt v. Apfel, No. 98-

1680, 1999 WL 179476, at *9 (E.D. La. Mar. 31, 1999). The ALJ's decision not to

include any mental limitations in plaintiff's residual functional capacity is therefore

supported by substantial evidence.

Burton argues that the ALJ also erred by failing to find that plaintiff cannot

crouch, squat or stoop.  The ALJ accorded "substantial weight" to the opinion of

consultative examiner Jonathan Sanders, M.D., who examined Burton on September 23,

2010 and "opined that the claimant is not able to crouch, squat, or stoop secondary to

pain. (Exhibit 10F).  The [ALJ] finds these limitations are consistent with the objective

evidence of record and the claimant's partially credible complaints."   (Tr. 20).

Nonetheless, the ALJ found that Burton can occasionally stoop and crouch (Tr. 17), and

included that limitation in her hypotheticals to the vocational expert.  (Tr. 54).

Dr. Sanders stated in his report that plaintiff "cannot crouch, squat, stoop

secondary to pain." (Tr. 305).  Despite the ALJ's statement that this was consistent with

the record, the entirety of the record, including Dr. Sanders's own findings on physical

examination, substantially supports the ALJ's finding that plaintiff can occasionally

crouch or stoop.  Dr. Sanders noted that Burton can push, pull and reach and climb on and off the exam table and dress and undress herself independently.  All of his physical examination findings were normal, except that plaintiff had a positive straight leg raising test bilaterally, decreased range of motion in her lumbar spine and scoliosis[12] in her lumbar spine.  Id.

As the ALJ's summary of Burton's medical records accurately indicates, her treatment records similarly indicate "generally mild" objective findings that do not fully substantiate her subjective and only partially credible complaints of pain.  (Tr. 18-19).  Timothy Honigman, M.D., reviewed plaintiff's records on September 27, 2010 and assigned her a light residual functional capacity with respiratory precautions, which included his findings that she could occasionally climb, balance, stoop, kneel, crouch and crawl.  (Tr. 68-69, 307).

Burton was examined by Keith W. Van Meter, M.D., at the Medical Center of Louisiana New Orleans ("MCLNO") Urgent Care Clinic on January 18, 2011, where she complained of a 10-year history of lower back pain with a recent exacerbation and radiation into her buttocks and leg, greater on the right than the left.  She had normal gait and neurological screening, with some reduced reflexes in her lower extremities.  Straight

---

[12]Scoliosis is "a lateral curvature of the spine."  MedlinePlus, http://www.merriam-webster.com/medlineplus/scoliosis%20.

leg raising "accentuate[s] the pain and perhaps does cause some radiation of discomfort into her buttocks and legs." Dr. Van Meter referred plaintiff to Physical Medicine to consider disk disease in her lower back. (Tr. 328).

Burton saw her internist, Dr. Millet, on January 31, 2011, seeking a change in her anxiety medication. She had no complaints of pain, was not in pain and needed no assistance in her activities of daily living. (Tr. 411). On physical examination, she had a full range of motion in all joints of her extremities with normal sensation to pinprick in all areas of both feet. (Tr. 415).

Plaintiff presented to the Physical Medicine/Rehabilitation Clinic of the MCLNO on February 16, 2011 with the same complaints as on January 18, 2011, where she was evaluated by Satvik Munshi, M.D. and Lisa Mary Jaubert-Miazza, M.D. Physical examination revealed normal muscle strength and intact sensation, except some dullness in the soles of her feet. In her lumbar spine, Burton exhibited positive facet[13] loading on the right and increased pain on lumbar flexion, but good extension and rotation. Her midline lumbar spine was nontender to palpation. She had mild pain in the right lower lumbar spine, moderate to severe tenderness to palpation of the right sacroiliac joint and

---

[13]A facet is "a smooth flat or nearly flat circumscribed anatomical surface[, such as] the articular facet of a bone." MedlinePlus Medical Dictionary, http://www.merriam-webster.com/medlineplus/facet. "The facet joints are a pair of joints in the posterior aspect of the spine. . . . [Facets] . . . are the articular cartilage lining small joints in the body . . . ." Medscape, Lumbosacral Facet Syndrome (Gerard A. Malanga, M.D.), http://emedicine.medscape.com/article/94871-overview (last visited Dec. 23, 2013)

tenderness to palpation of the greater trochanter[14] bursae[15] bilaterally, more severe on the left. Plaintiff's straight leg raising test was negative. She had decreased range of motion and flexibility in her left sacroiliac joint without tenderness. The diagnosis was chronic low back pain, likely lumbar radiculopathy;[16] right sacroiliitis; and right greater trochanter bursitis. She received injections of steroids in her right sacroiliac joint and right greater trochanter bursa, which provided immediate relief of pain. (Tr. 331).

Burton returned to see Dr. Munshi and Maxim Moradian, M.D., on April 20, 2011. She reported that she had received 75 percent relief of pain for about three weeks after the injections. She had increased her activity, was currently ambulating for five miles four days per week and had intentionally lost 75 pounds. She reported pain in her right buttocks, right thigh and feet with walking, but she kept walking. Physical examination revealed some decreased muscle strength in her right hip and knee, but sensation and reflexes were intact. The doctors noted a muscle imbalance between her right and left

---

[14]"[A] rough prominence or process at the upper part of the femur [the longest and largest bone in the human body, which extends from the hip to the knee], serving usually for the attachment of muscles and being usually two on each femur in mammals including humans: a: a larger one situated on the outer part of the upper end of the shaft at its junction with the neck–called also greater trochanter . . . ." MedlinePlus Medical Dictionary, http://www.merriam-webster.com/medlineplus/trochanter.

[15]A bursa is "a bodily pouch or sac: . . . as a small serous sac between a tendon and a bone." Id. http://www.merriam-webster.com/medlineplus/bursa.

[16]Neuropathy is "any pathological condition of the nerve roots." Id. http://www.merriam-webster.com/medlineplus/radiculopathy.

sides.  She exhibited mild tenderness to palpation over the right and left sacroiliac joints and moderate tenderness over the right greater trochanter bursa area.  She had full active assisted range of motion of her lumbar spine, but very poor lumbar flexion actively.  She had various positive test results over the right sacroiliac joint, including pain on palpation.  After reviewing an MRI of plaintiff's lumbar spine, the physicians diagnosed right sacroiliac joint pain, possibly secondary to thoracolumbar scoliosis; right greater trochanter bursitis as a result of muscular imbalance; possible L5-S1 discogenic pain; and possible right lower lumbar facet arthropathy.[17]  The plan was to refer Burton "to Dr. Kaye in interventional anesthesia pain management" for an epidural steroid injection at the L5-S1 level.  Injection of her sacroiliac joint was deferred at her request.  She was advised to continue her home exercise program and return in six months.  (Tr. 334).

On June 28, 2011, plaintiff saw Mariam Chowdhry, D.O., and a staff physician at the Louisiana State University Health Care outpatient department. Burton had a negative straight leg raising test and normal gait, but exhibited positive facet loading, painful flexion and tenderness to palpation over her right sacroiliac joint.  She was still "waiting for Dr. Kaye's injection" and was advised to continue weight loss.  The staff physician noted that plaintiff had no changes since her prior examination, except she had new

---

[17]Arthropathy is "a disease of a joint."  Id. http://www.merriam-webster.com/medlineplus/arthropathy.

symptoms of numbness in the fingers of her right hand.  The diagnosis was chronic low back pain and bilateral carpal tunnel syndrome.  Injections for carpal tunnel syndrome could not be performed because of Burton's high blood sugar.  (Tr. 349).

The ALJ thoroughly considered all of the medical records dated before and since May 20, 2010, the date when plaintiff was previously adjudicated not disabled.  The entirety of the records and the ALJ's finding that plaintiff's complaints are only partially credible substantially support the conclusion that she can occasionally stoop and crouch.  Accordingly, this assignment of error lacks merit.

> 3. The ALJ's findings that plaintiff's headaches, sleep apnea and carpal tunnel syndrome are not severe impairments are irrelevant and non-prejudicial when the ALJ found her disabled at step five.

In her third and fourth assignments of error, Burton argues that the ALJ's findings that her headaches, sleep apnea and carpal tunnel syndrome are not severe are contrary to Stone v. Heckler, 752 F.2d 1099, 1011 (5th Cir. 1985), and are not supported by substantial evidence.  In the Fifth Circuit, "[a]n impairment is not severe 'only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'"  Herrera v. Comm'r of Soc. Sec., 406 F. App'x 899, 902 (5th Cir. 2010) (quoting Loza v. Apfel, 219 F.3d 378, 391 (5th Cir. 2000)).  The ALJ in the instant case cited the relevant standard and explained why she found at step two of the sequential

40

evaluation that plaintiff's impairments, other than back and leg pain, scoliosis, diabetes, history of headaches and obesity, are not severe.

When the ALJ has proceeded beyond step two to find that plaintiff is not disabled at a subsequent step, plaintiff's argument that the ALJ failed to find that a particular impairment is severe

> is inapposite because the ALJ did not [deny] plaintiff's benefits based on a finding that her impairments are not severe. See Chapparo v. Bowen, 815 F.2d 1008, 1011 (5th Cir. 1987) (argument regarding improper application of Stone standard irrelevant to disposition of case if outcome of case [did] not turn on issue of severity); see also Shipley v. Director of Health and Human Services, 812 F.2d 934, 935 (5th Cir. 1987). The ALJ's report contains a statement of the Stone standard and a determination that as it applied to this case, [one of claimant's several alleged impairments] is a severe impairment. . . . The ALJ then proceeded to the next step of the sequential evaluation and assessed whether an impairment or a combination of plaintiff's impairments met or exceeded the severity of the impairments listed in the appendix. See 20 C.F.R. § 404.1594(f)(2). In the absence of a "non-severe" finding as to any one of plaintiff's impairments and a decision to [deny] plaintiff's benefits based on a "non-severe" finding, plaintiff cannot complain that any prejudice resulted from the ALJ's performance at this stage in the evaluation. See Brock v. Chater, 84 F.3d 726, 729 (5th Cir. 1996) (decision will not be reversed where claimant makes no showing that she was prejudiced by deficiencies she alleges).

Lawrence v. Barnhart, No. 01-1366, 2002 WL 356316, at *2 (E.D. La. Mar. 4, 2002) (emphasis added); see also Bradshaw v. Astrue, No. 1:07-CV-0150-C, 2008 WL 4387087, at *6 (N.D. Tex. Sept. 26, 2008) (citing Robinson v. Barnhart, 183 F. App'x 451, 455 (5th Cir. 2006); Reyes v. Sullivan, 915 F.2d 151, 154 n.1 (5th Cir. 1990);

Chapparo, 815 F.2d at 1011) ("In more recent cases, the Fifth Circuit has found no merit to claimants' arguments of ALJ error arising out of the failure to correctly apply or state the Stone standard where the sequential evaluation process proceeds past step 2.").

Having found that Burton had several severe impairments, the ALJ proceeded through the subsequent steps of the evaluation, considered all of the evidence concerning plaintiff's medically determinable impairments and found at the fifth step that she is capable of performing available work. The ALJ's failure to find at step two that Burton's other impairments were severe is irrelevant and non-prejudicial to plaintiff. Accordingly, this assignment of error is meritless.

## CONCLUSION

The vocational expert's testimony that jobs are available that a person with plaintiff's residual functional capacity could perform is substantial evidence on which the ALJ properly relied. Transferability of skills was not material to the ALJ's decision. Any discrepancy between the vocational expert's testimony and the Dictionary of Occupational Titles was not prejudicial to plaintiff. The ALJ applied the correct legal standard when determining plaintiff's residual functional capacity and her findings are supported by substantial evidence. Any error in the ALJ's determination that Burton's headaches, sleep apnea and carpal tunnel syndrome are not severe does not prejudice her

substantial rights because the ALJ's determination that plaintiff is not disabled was not based on a finding that her impairments were non-severe.

## **RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v.

United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[18]

New Orleans, Louisiana, this ___30th___ day of December, 2013.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[18]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.